[Civ. No. 1512.　Third Appellate District.—May 27, 1916.]

## ESTELLA PORTERFIELD et al., Respondents, v. THE CITY OF MODESTO, Appellant.

NEGLIGENCE—DEATH OF LABORER IN SEWER TRENCH—DANGEROUS PLACE TO WORK — LACK OF WARNING — LIABILITY OF MUNICIPALITY.— A municipal corporation is liable in damages for the death of a laborer resulting from injuries received while working in a sewer trench being constructed by such corporation, where he was ordered by the agent of the corporation to go into the trench and shovel dirt around a manhole being therein constructed after the bracing and cribbing at the place where he was directed to work had been previously removed, leaving the walls of the trench without support, and no special warning given him of the danger from caving in of the excavation.

APPEAL from a judgment of the Superior Court of Stanislaus County. L. W. Fulkerth, Judge.

The facts are stated in the opinion of the court.

E. R. Jones, and L. J. Maddux, for Appellant.

J. W. Hawkins, for Respondents.

CHIPMAN, P. J.—This is an action brought by plaintiffs, Estella and Agnes Porterfield, to recover damages for the death of Charles Porterfield, the husband and father, respectively, of plaintiffs. Porterfield's death resulted from injuries received while working as a laborer in a sewer trench being constructed by the city of Modesto. The councilmen of the city were made parties defendant, but, by consent of plaintiffs' counsel, the court instructed the jury that if they found for the plaintiffs the verdict should be against the city of Modesto only. The case was tried by the superior court with a jury, and a verdict was rendered in favor of plaintiffs for the sum of seven thousand five hundred dollars. Based upon the verdict, a judgment was entered for said sum in favor of plaintiffs, from which defendant has appealed under the alternative method.

The record is singularly free from any claim of errors of the court in conducting the trial. The instructions were clear and succinct statements of the law necessary for the guidance of the jury and are in nowise challenged. The nature and extent of the grounds for the appeal will be found in the following statement in defendant's brief: "The theory of the defense at the trial of said action and on this appeal is that the injuries received by said Charles Porterfield, and which resulted in his death, were received not in the line of his duty, but were caused by his gross carelessness in disobeying the orders of his superior, G. H. Freitas (city engineer in charge of the work) ; and also that the verdict is contrary to the evidence, for the reason that there was an utter failure on the part of the plaintiffs to establish the negligence alleged in the complaint." In short, the defense was contributory negligence by the deceased.

It was alleged in the complaint that the said construction work was in charge of said engineer, Freitas, pursuant to the resolution of defendant; that, on October 9, 1913, a portion of the excavation or trench for the sewer pipe had been opened up for some distance and the sewer pipe laid therein and the trench ordered by the city to be closed; that the soil through which the trench was dug was of such nature that to prevent its caving and falling upon laborers working in the trench it was necessary that the sides of the trench should be secured by cribbing, in the absence of which it was a dangerous and unsafe place to work, a fact well known to defendants; that,

notwithstanding such fact and such knowledge by defendants, Porterfield was ordered by defendants to go into the trench and shovel dirt around a manhole being therein constructed; that the bracings or cribbing at the place where Porterfield was directed to work had previously been removed, thus leaving the walls of the trench without support and liable to cave in and fall upon him when he was at work; that it was unnecessary to send him into the trench for the purpose above stated for the reason that, as had elsewhere been done in filling the trench, earth which had been thrown out of the trench and lying along the sides at the top could have been used for the purpose of filling around the manhole; "that while the said Charles Porterfield was carrying out the instructions of the defendants, and was in said trench for the purpose of shoveling said dirt around said manhole, the said bank of said ditch caved in and upon the said Charles Porterfield and crushed his head, and the said Charles Porterfield did, on the 10th day of October, 1913, die as a result of said injury"; that defendant did not provide said Porterfield a reasonably safe place in which to work, "in that said defendant did not keep said ditch cribbed and braced. That said defendant sent said Charles Porterfield into a place unsafe to work in with full knowledge of the dangerous condition of said place." With much amplification the complaint sets forth the facts of which the foregoing is a brief summary.

The testimony was that the trench had been closed up to a point near to and east of the manhole, and had also been filled west of the manhole within about six or seven feet of the top. The manhole was in course of construction and was completed to a point a few feet from the top. The following description of the manner in which the work was done is taken from respondents' brief and is in accordance with the testimony:

"According to the testimony of all the witnesses the soil in the city of Modesto where the sewer was being constructed had on top a strata of hard material, and underlying this was loose running sand. The cave-in was on F street, between Fifth and Sixth streets. As the excavation was opened up cribbing was placed in the excavation to keep the ground from caving in. The first row of cribbing extended down ten feet and was composed of upright boards placed on both sides of the excavation and held apart by jacks. The second row of cribbing extended down the rest of the distance and was

constructed for the same purpose and in the same manner as the first row of cribbing. Always, prior to the death of Porterfield, it was customary for the excavation to be filled before removing the cribbing. The filling-in was done in the following manner: Dirt was filled in until it reached the first row of jacks, then the lowest row of jacks was removed and dirt filled up to second row of jacks, which were then taken out and the filling-in progressed as before until the excavation had been filled up to the top of the lower row of cribbing. Then the lower row of cribbing was pulled out by means of chains and jack screws, the upper row of cribbing still remaining in place. The lower row of jacks on the upper row of cribbing was then removed, and the filling progressed as before, each row of jacks being removed as the dirt in the excavation was filled until the whole excavation was filled. Thereupon the upper row of cribbing was removed by pulling out the upright boards with chain and jack.

"When Porterfield was killed the cribbing had all been removed but the excavation had not been filled up, and the workmen had placed cribbing at one point only in the excavation and that was right at the manhole, the excavation being cribbed for the distance of six feet directly opposite the place where the manhole was being constructed. The banks of the excavation west of the manhole had cracked but had not fallen into the excavation. The engineer in charge of the work knew of this fact. Always, prior to the time Porterfield was killed, the excavation had been filled from the top and at the time Porterfield was killed there was plenty of dirt on top of the ground and adjacent to the excavation to fill up the excavation. This dirt was the same dirt that had come from the excavation. Engineer Freitas was in charge of the work for the city of Modesto. The sewer pipe had been laid in the trench and a manhole was being constructed. The manhole was being constructed with brick and was circular in form. As the masons laid the brick it was necessary to fill in dirt around the manhole to give the masons a place to stand on."

The following statement of respondents' counsel presents the only controverted question of importance in the case: "Some jacks and timbers had been left in the excavation around and near the manhole and Engineer Freitas told Porterfield to go down into the trench and throw out the

jacks and timbers and fill in around the manhole for the purpose of giving the masons a footing on which to work. Porterfield went down into the trench on the west side of the manhole to carry out the orders given him and the cracked bank of the excavation fell in upon Porterfield and killed him.''

There is no substantial conflict in the evidence except as to the instructions given to Porterfield in obedience to which he went into the trench, and upon this point the only direct testimony was given by witness G. W. Bowman, a laborer at work at the manhole, and the testimony of George H. Freitas, the engineer in charge. Bowman testified that he was working at the manhole mentioned in the evidence and was asked if he heard Engineer Freitas say anything to Porterfield the afternoon the latter was hurt. ''A. Well, he told him to go down in the ditch and clean up and fill in around the manhole. Q. Do you know whether he went down into the ditch or not? A. Yes, sir; he went down. Q. What did he do when he went down there, if you know? A. Well, he taken some jacks and timbers—2x6's and 2x8's out and put them up on the bank. Q. They were lying loose on the ground in there? A. Yes, sir. They had taken out from around the manhole and throwed them back, and he put them on the bank. Q. He put them upon the bank? A. Yes. Q. Now, what happened? A. Well, I don't know just how long he had been in there but it hadn't been but a short time until he got caught—got crushed. He hadn't been very long however. Q. How did he get crushed? A. Well, he was—it seems as though he was standing leaning up against the north bank and a chunk of dirt came from the south and caught him. Q. Anyway, he was pinned against the north bank? A. Yes. Q. By a chunk of dirt? A. Yes, sir. Q. How big a chunk was that? A. Oh, I don't know; I guess it would weigh 1,800 or 2,000 or something like that. Q. You were there and saw him pinned? A. No, I didn't see him; I seen him a few seconds afterward. I was up at the mortar box, a little ways. I don't know, fifteen or twenty feet. Q. What did you do? A. Well, Mr. Freitas and I and Mr. Mueller—Phil Mueller— went down in there and tried to move it and could not do it and I taken a pick and broke the top of it off and we pulled him out and laid him out on the bank. . . . Q. Now, had you seen the ground there prior to this time—before he got hurt?

A. Yes, sir.  Q. What was the condition of it before? A.
Well, after the sand tumbled from under it you know there
was a great long slide of it cracked away back and came out
to a peak up here you know where that chunk broke off; you
see after we taken the timbers out it cracked out aways from
the edge of the ditch, you know; just had been hanging there,
I don't know, a couple of weeks or maybe something like
that.''  He testified that anyone going along this ditch could
see this crack, and that Mr. Freitas was up and down along
the ditch frequently every day.  He testified, and other wit-
nesses testified to the fact, that the top earth for a few feet
down was compact, but below the formation was almost pure
sand and had to be cribbed to hold it in place; that the sewer
was about sixteen or seventeen feet deep and had been filled
up at the manhole within six or eight feet of the top; that
there was dirt a few feet from the edge of the ditch which
had been thrown out in digging it.  It appeared that about
twenty-five or thirty feet west of the manhole the trench had
been filled up within three or three and one-half feet of the
top.  On cross-examination the witness testified that Porter-
field went into the ditch at this point.  It further appeared
that the earth, in filling at this point, assumed a slope down
toward the manhole to a point ten or twelve feet from the
manhole.  The witness testified that it was after he had seen
Porterfield go into the ditch that he ''saw him throwing out
jacks and timbers. . . . He went in there where it was shallow
and went down in there where it was deeper you see toward
the manhole to clean up.  Q. Yes; you say Mr. Freitas told
him to do that?  A. Yes, sir.  Q. Did you hear Mr. Freitas
say it?  A. Yes. . . . Q. Well, had he taken out all the tim-
bers and jack-screws?  A. Yes.  He had taken them all out
and commenced to shovel the dirt down.''  He testified: ''When
I got there you see to help to get him out a chunk of dirt
had caught him and he was standing right against the north
wall and the chunk came from the south. . . . His shovel was
sitting there when the chunk of dirt caught him, sitting up by
his side like.''  On further cross-examination he testified, in
answer to a question whether he saw Porterfield in the ditch:
''No, I didn't see him in the ditch; only when I was carrying
mortar up—you see I carried mortar from the box up to the
manhole and dumped it and I just got dumped out a pail-full
and came back and seen him in there.  Q. I say, you did not

see Porterfield in the ditch before he was injured? A. Yes.
Q. You say you did see him in the ditch? A. Yes." After
the accident Porterfield was found in an upright position with
his back against the north wall of the trench and ten or eleven
feet from the manhole. The "chunk" of earth mentioned
by the witness came from the south side where the crack was.

Engineer Freitas testified that he had full charge of the
work on the sewer, and that Porterfield was working with
pick and shovel under his direction; that, in the afternoon,
about 4:30 o'clock, he directed Porterfield to assist in
hauling some brick to the manhole referred to in the testi-
mony. "Q. Just state what you told him to do. A. Well, I
told Mr. Porterfield that when he got through that brick work
—hauling the brick, that he was to assist the men around
the manhole by back-filling or shoveling dirt back against the
manhole. Q. Where did you intend or tell him to stand in
doing the work, in the ditch or on the ditch? A. I directed
that he should stand in the ditch. . . . Q. What did you tell
him? A. I told Mr. Porterfield to fill in from a point where
the trench was shallowest, and indicated the point where I
wanted him to work. Q. Where did you indicate to him?
A. I indicated a point down along about between where it is
three and a half feet deep and three feet deep in the diagram
(indicating)." He testified that the sewer at that point was
sixteen feet deep, but it had been partly filled and was between
three and three and a half feet at the point indicated and
sloped down to the manhole where it was about eight feet
deep; that he sent Porterfield into the ditch to fill out the time
until 5 o'clock, quitting time; that the ditch was forty-four
inches wide; that the distance from the point where he testified
he directed Porterfield to stand to the center of the manhole was
twenty-seven and one-half feet; that the crack in the earth,
mentioned by witnesses, commenced about where Porterfield
was to stand (a photograph was introduced showing the sur-
face and the ditch in that vicinity). "The back filling was gen-
erally done from the top. That was the regular way of doing.
Q. What was the object of having it done from this trench on
this special occasion? A. Why, at that time the men were
working around the manhole—the brickmen and their
assistants, and it wasn't possible to throw the dirt from
the top over the top of these men; it would interfere
with their work. Q. Well, I believe you said it was

done for the purpose of filling in a few moments of extra time. A. That is all, just had the time to fill in from that until 5 o'clock, just simply to keep him busy." He also stated that another reason was to avoid making a dust to the annoyance of the brick masons. . . . "Q. Do you know whether or not the deceased Charles Porterfield went to work at the point? A. I do not. Q. Did you see him in the trench at all? A. Not until after the accident happened and I helped to take him out." He testified that Porterfield was found at a point about sixteen feet from where witness directed him to go to work; that he saw no shovel where Porterfield was found; that there was no necessity for his going there in the line of his duty. "Q. What did you say to Charles Porterfield, if anything, about going into dangerous places? A. Well, I don't know that I ever spoke to him directly. I spoke to the men generally—gave them instructions to always be careful and to be sure wherever they were working that everything was safe and secure." He was asked if Porterfield was present when he gave such instructions and answered: "I believe he was." He testified that at the point where Porterfield was hurt the cribbing had been removed, and that there had been cribbing there, and nothing remained to be done but to fill the ditch except the work at the manhole. A photograph was introduced representing a man standing in the trench where the witness testified Porterfield was killed, which, he testified, was eleven feet from the manhole. Several photographs were introduced to assist the jury in understanding the testimony, but we do not think it necessary to incorporate them in this opinion. On cross-examination the witness was again asked what he said to Porterfield and answered as before: "I told him I wanted the dirt filled from the point—the shallowest point— low point where the back fill had been made to within three and a half to three feet of the top of the ground. Q. Well, did you say all that? A. I don't know that I did. I told him there is the point that I wanted the dirt from. Q. Did you go over opposite or standing where you were? A. Standing where I was standing. . . . Q. All right. Did you say anything more? A. I did not. . . . I was right at the manhole at the time, where they were building the manhole. The top is about 26 inches in diameter and 8 feet down, about three · feet. . . . The brick was done to about 8 feet of the bottom."

He testified that the conditions were such as to justify him in taking out the cribbing "except right around the manhole. Q. Well, there was a big crack there that came after taking it out, wasn't there? A. That occurred after the cribbing was removed. Q. Yes. You saw that crack before the accident happened, didn't you? A. I did. I knew it was there. . . . Q. Now, if you had left the cribbing in there you could have filled in around the manhole just the same, couldn't you? A. I could have, yes." Referring to Porterfield when found, he was asked: "And in what position was he? A. He was standing. Q. He was standing up? A. Yes. Q. And the lump of dirt had apparently just tipped over like that and caught him? A. Yes." He testified that there had been other "cave-ins" during the construction of the work prior to this time. . . . "Q. When you placed Mr. Porterfield at the point where you say you told him to go, did you tell him that to go down further would be dangerous? A. I don't think I did." He testified that after the ditch had been partly filled there was danger of its breaking back. He also testified that when the men were opening the trench at first "they generally throw it pretty well back off the street and generally get it back to the curb line, which would be about twenty-five feet from the center line of the street."

Appellant's contention is that the verdict of the jury must necessarily have been formed upon the testimony of these two witnesses. "We contend," says the brief, "that when the jurors rejected the direct and positive testimony of Mr. G. H. Freitas, and brought in a verdict based upon the testimony of Bowman, that they were acting under passion and prejudice and were carried away by sympathy for the young widow and her child." And we are admonished to read carefully the testimony with the assurance that "it must be evident from the answers given by Bowman, especially on his cross-examination, that he was trying to build up a case for the plaintiffs." We have endeavored to comply with this admonition. It is true that Bowman's testimony at the trial did not harmonize in all respects with his testimony at the coroner's inquest; also that he testified at the trial to some important facts not brought out at the inquest. Experience shows that these features are not unusual. In preliminary inquiries, especially in coroner's inquests involving no element of crime, it is seldom found necessary to enter into a minute examina-

tion of all the facts. At any rate, the duty of sifting out the truth and determining the credence to be given to testimony given by witnesses is so peculiarly the function of the jury that the reviewing court cannot interfere with their conclusion unless, as is claimed here, it can safely be said that such conclusion was the result of passion and prejudice controlling the minds of the jurors. We do not feel warranted in holding that the verdict was reached under any such influence.

There was evidence justifying the jury in finding that Porterfield was directed by the engineer in charge to work at a place in the trench admittedly known by the engineer to be dangerous. That it was dangerous appeared from the fact that shortly after he had commenced work Porterfield was killed, and was killed by the caving in of a block of earth which had for some days given evidence of its liability to fall into the trench. Whether Porterfield knew of the danger, or to what extent he appreciated it, we do not know. As the cracking of the earth at the point where he was killed was known to Bowman, his fellow-laborer at the manhole, it is fair to assume that Porterfield had observed it, but we cannot assume, when told to go into the trench by one who had the authority to direct the work, that he appreciated the danger and recklessly exposed himself to the consequences and the risks attendant upon the performance of the orders given him. Indeed, we do not understand appellant to claim this. Its claim is that he was told to work at a point in the trench where, in fact, there was no danger, and that he voluntarily and needlessly assumed a position of peril, and hence plaintiff cannot recover. But appellant overlooks or entirely rejects the testimony that deceased was told to go to work at the very point where he was killed.

If we could unhesitatingly accept appellant's view of the evidence we might accept its construction of the Employers' Liability Act of 1911 (Stats. 1911, p. 796), namely, that while the statute has abolished the doctrine of assumption of risk and "while the employer must furnish his employees with safety appliances and safe places to work, that, nevertheless, the moment the employee, without so being required by his duties and not acting under orders of his employer, leaves that safe place and goes off on private excursions of his own to other parts of the work, he becomes nothing more than a trespasser so far as any liability for injuries received by him

is concerned. We do not understand it to have been the intention of the law makers, in abolishing assumption of risk, to have intended to make the employer liable regardless of how or when the employee is injured." This may be a reasonable view of the statute where the facts furnish a proper basis for it. The trouble with accepting it in the present case is that it rests upon an assumed state of facts which the jury, within their powers, manifestly rejected. Upon the facts which the jury were authorized to accept, it seems to us that there was culpable negligence in sending the deceased to work in a place concededly dangerous, and especially was it negligence to do so without specifically warning deceased of the danger. The only warning given deceased was of a general nature at other times, if any was given, on one other occasion, as appeared, when the men were taking out some cribbing. Freitas was better able to judge of the danger than was deceased, and the latter might well have assumed the work he was told to do was not imminently dangerous or his superior would not have directed him to go there. The law governing such a situation is too well known to call for citation of authorities.

The learned trial judge gave instructions upon the subject, to which no objection is now made, quite as favorable to defendant as the case would admit of, and it seems to us in taking them as their guide the jury were supported in their verdict by the evidence.

The judgment is affirmed.

Hart, J., and Ellison, J., *pro tem.*, concurred.